**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

DON RAY THOMPSON,        :

      Petitioner,         :

vs.             : CIVIL ACTION NO. 09-0611-WS

UNITED STATES OF      : CRIMINAL ACTION NO. 08-0069-WS
AMERICA,

               :

      Respondent.

## REPORT AND RECOMMENDATION

Petitioner, Don Ray Thompson, a federal prison inmate proceeding *pro se*, has filed a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. 73). This action has been referred to the undersigned for entry of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Following consideration of all relevant pleadings in this case, it is recommended that Thompson's § 2255 motion be denied and that it be found he is not entitled to a certificate of appealability.

## FINDINGS OF FACT

1.      On February 28, 2008, Thompson was charged by indictment with one count of conspiracy to possess with intent to distribute more than 50 grams of crack cocaine in violation of 21 U.S.C. § 846, one count of

possession with intent to distribute 5.2 grams of crack cocaine on February 21, 2008 in violation of 21 U.S.C. § 841(a)(1), and one count of possession with intent to distribute 20 units of 3,4-methylendioxymethamphetamine, Ecstasy, on February 21, 2008 in violation of 21 U.S.C. § 841(a)(1). (Doc. 1)

2.      At the pretrial conference on April 8, 2008, Thompson, through his attorney, Robert Ratliff, Esquire, notified the Court of his intent to change his plea to guilty. (*See* Doc. 27)

3.      On April 14, 2008, the parties filed a plea agreement and factual resume with the Court. (Doc. 30) The plea agreement reads, in relevant part, as follows:

## PLEA AGREEMENT

The above[-]captioned defendant, represented by his counsel, and the United States of America have reached a Plea Agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

## RIGHTS OF THE DEFENDANT

1.      The defendant understands his rights as follows:

a.      To be represented by an attorney;

b.      To plead not guilty;

c.      To have a trial by an impartial jury;

d.      To confront and cross-examine witnesses and to

2

call witnesses and produce other evidence in his defense;

e.      To not be compelled to incriminate himself.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

2.      The defendant waives rights b through e, listed above, and pleads guilty to Count 1 of the Indictment, charging a violation of Title 21, United States Code, Section 846, conspiracy to possess with intent to distribute a mixture and substance containing a detectable amount of cocaine base, commonly known as crack cocaine, a Schedule II controlled substance.

.      .      .

3.      The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

4.      The defendant is not under the influence of alcohol, drugs, or narcotics.  He is certain that he is in full possession of his senses and mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

5.      The defendant has had the benefit of legal counsel in negotiating this Plea Agreement.  He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charges which have been brought against him.  The defendant's attorney has also explained to the defendant [his] understanding of the United States' evidence.

6.      The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charges beyond a reasonable doubt.  The defendant and his counsel have discussed possible defenses to the charges. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

3

7.     A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing.  The Factual Resume is incorporated by reference into this Plea Agreement.  The defendant and the United States agree that the Factual Resume is true and correct.

8.     This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations apart from those set forth in this Plea Agreement.  There have been no promises from anyone as to the particular sentence that the Court may impose.  The defendant avers that he is pleading guilty because he knows that he is guilty.

## PENALTY

9.     The maximum penalty the Court could impose as to Count 1 of the Indictment is:

a.     10 years to life imprisonment;

b.     A fine not to exceed $4,000,000;

c.     A term of supervised release of 5 years, which would follow any term of imprisonment.  If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

d.     A mandatory special assessment of $100.

## SENTENCING

10.    The Court will impose the sentence in this case. The United States Sentencing Guidelines apply in an advisory manner to this case.  The defendant has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation. The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance

4

with the Guidelines.  The defendant understands that he will not be allowed to withdraw his guilty plea if the applicable guideline range is higher than expected, if the Court departs from the applicable advisory guideline range, or if the Court imposes a sentence notwithstanding the Guidelines.

11.    The United States may provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

12.    The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

13.    Both the defendant and the United States are free to allocute fully at the time of sentencing.

14.    The defendant agrees to tender $100 to the United States District Court Clerk in satisfaction of the mandatory special assessment in this case. The United States reserves the right to <u>withdraw</u> any favorable recommendation it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

## UNITED STATES' OBLIGATIONS

15.    The United States will not bring any additional charges against the defendant related to the facts underlying the Indictment and will move to dismiss the remaining counts in the Indictment as to the defendant at sentencing.  This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

## APPLICATION OF U.S.S.G. § 5K1.1 AND/OR FED.R.CRIM.P. 35

16.     The defendant agrees to cooperate with the United States under the following terms and conditions:

a.     The defendant shall **fully, completely, and truthfully** respond to all questions put to him by law enforcement authorities regarding the underlying facts of the offenses with which he is charged, as well as the underlying facts of **any** criminal offenses, state or federal, of which he has information or knowledge.

b.     The defendant acknowledges that he understands that he shall provide **truthful and complete** information regarding **any** offense about which he has knowledge or information regardless of whether or not law enforcement authorities question him specifically about any such offense.  This provision requires the defendant to divulge all information available to him even when law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any particular offense.  This requirement extends to **any and all persons** about whom the defendant has such knowledge or information.

c.     The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which his cooperation may be deemed relevant by any law enforcement authority.  The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance he shall provide.  This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying **completely and truthfully** before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d.     If the United States deems it necessary, the defendant may be required to take a polygraph examination[] which will be administered by a government polygrapher.  The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether or not there has been substantial

assistance, and are admissible to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.  It is also the intent of the parties that the results of any polygraph examination are admissible at the defendant's sentencing, or in the event that the defendant appears as a witness at any proceeding to testify under oath about events relating to the subject matter of the polygraph examination.

e.      The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in his possession or under his control and which are relevant to his participation in and knowledge of criminal activities whether relating to the charged offense or not.  This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f.      The defendant agrees to confess the forfeiture to the United States of all properties which represent proceeds of his criminal activities or which facilitated any aspect of these illegal activities.  The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

g.      If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable.  The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation.  The defendant understands that the United States will make no representation or promise

7

with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance.  The defendant understands that a mere interview with law enforcement authorities does not constitute substantial assistance for this purpose.  The defendant also understands that should he provide untruthful information to the United States at any time, or should he fail to disclose material facts to the United States at any time, the United States will not make a motion for downward departure.  If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend to the district court judge who sentences the defendant that the defendant receive a sentence at the low end of the applicable advisory guideline range.

.    .    .

## LIMITED WAIVER OF RIGHT TO APPEAL SENTENCE

17.    The defendant acknowledges that he is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.  In exchange for the recommendations made by the United States in this Plea Agreement, the defendant knowingly and voluntarily waives the right to appeal any sentence imposed in this case.  "Any sentence imposed" includes any proceeding relating to the modification or revocation of the supervised release term.

18.    With the limited exceptions noted below, the defendant also waives his right to challenge any sentence so imposed, or the manner in which it was determined, in any collateral attack, including[,] but not limited to, a motion brought under 28 U.S.C. § 2255.

19.    The defendant reserves the right to contest in an appeal or post-conviction proceeding any of the following:

a.    Any punishment imposed in excess of the

8

statutory maximum;

       b.      Any punishment that constitutes an upward departure from the guideline range; or

       c.      A claim of ineffective assistance of counsel.

.     .     .

## VIOLATION OF AGREEMENT

21.     The defendant understands that if he violates any provision of this agreement, the United States will be free from any obligations imposed by this agreement and will be free to prosecute the defendant on any charges of which it has knowledge.  In such event, the defendant agrees not to assert any objections to prosecution that he might have under the 6th Amendment and/or Speedy Trial Act.

## ENTIRETY OF AGREEMENT

22.     This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

(Doc. 30, at 1, 2-8 & 9-10 (emphasis in original)) Appearing before

Thompson's signature on page 11 of the agreement is this paragraph:

"I have consulted with my counsel and fully understand all my rights with

respect to the offenses charged in the Indictment pending against me.  **I**

**have read this Plea Agreement and carefully reviewed every part of it**

**with my attorney.  I understand this agreement, and I voluntarily agree**

**to it.**  I hereby stipulate that the Factual Resume,[1] incorporated herein, is

---

[1]      The Factual Resume, which Thompson also signed, reads as follows:

The United States of America, by and through the undersigned Assistant United States Attorney, and the defendant, by and through his attorney of record, agree and stipulate that the Government can prove the following facts beyond a reasonable doubt:

**Elements of the Offense**

**Count one:** 21 U.S.C. § 846, conspiracy to possess with intent to distribute crack cocaine, a Schedule II controlled substance.

There are two elements to this offense: first, that two or more individuals came to a mutual understanding to commit an unlawful act, in this case, the distribution of crack cocaine; and second, that the defendant, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in the plan. The Government has alleged that more than 50 grams of crack cocaine were involved in the conspiracy.

**Facts**

A confidential informant provided information to Prichard Police Officers that Don Ray Thompson, Jr., was involved in drug distribution.  On February 4, 2008, the informant saw Thompson in possession of 112 grams of crack cocaine. Later in the month, the informant was at Thomson's house, and reported to the police that he saw marijuana, a gun, and an ounce and a half of crack cocaine. Later that day, the informant was asked by Thompson to give him a ride to another house.  Thompson's residence was on Sandalwood, but he regularly sold drugs from a house on Goodpay, where he paid utilities and a fee to the owner of the house to use it for drug distribution.  Thompson told the informant that he was going to sell the crack and a half ounce of marijuana there.  The informant notified the police, and surveillance officers followed the informant and the defendant as they drove to the house on Goodpay.

On February 21, 2008, the informant was equipped by the police with electronic devices and called Thompson to arrange a controlled buy of crack cocaine.  Cpl. Daniel Stubbs heard the informant make the call, as a result of which the informant made a controlled buy of crack cocaine.  The officers obtained search warrants for both residences.  They executed the one at Goodpay, the drug house, first.  Thompson was there.  They recovered a gun from the first

true and accurate in every respect, and that had the matter proceeded to

bedroom and searched the living room, including the sofa.  Thompson was seated on the sofa while the officers continued to search.  Major Marvin Whitfield stood him up to advise him of his rights and determine whether he wanted to make a statement, and Cpl. Stubbs removed 5.2 grams of crack cocaine from the sofa where Thompson had been sitting.

Thompson agreed to make a statement, and he admitted that the crack cocaine in the sofa and the gun were his.  He also admitted that he had ecstasy tablets at the house on Sandalwood, and the police took him with them to execute the warrant there.  They found 20 tablets of MDMA in the pocket of an article of clothing in his room.  They also found a magazine for the gun recovered at the Goodpay house, and a scale.  Thompson said he used that scale to weigh marijuana.  Thompson also said the crack he had that day had been supplied by Paul Antonio Burke.  Thompson said he had known Burke for about 6 months.  Two days earlier, he had bought about a half-ounce of crack from Burke for $300.  Burke delivered the drugs in a 2006 Dodge Charger.  He estimated he received a total of about two ounces of crack cocaine from Burke during the last six months.

Thompson also admitted that he had drug dealings with "Q" and "Kelly," who were subsequently identified as Quentin King and Ivy Kelly Williams.  Thompson attempted to arrange an undercover drug deal with Burke, but Burke became suspicious and fled the scene on foot.  Thompson made telephone contact with Williams, ordering additional "yams," his code for crack cocaine.  Williams agreed, and arrived at the meeting location as a passenger in a car with Quentin King.  Williams' brother, Nathaniel Willie Williams, was in the back seat of the vehicle.  Williams sold Thompson .7 grams of crack cocaine.  The officers at the scene recovered the crack cocaine from Thompson.

Other police officers performed a traffic stop of the vehicle, and Williams and his brother both fled.  Both were apprehended after short pursuits by the officers.  Williams was arrested on state charge[s] of distribution of crack cocaine and transported to the police station.  King, the driver, was not charged at that time.

The parties agree that the defendant is accountable for 215 grams of crack cocaine and 20 tablets of MDMA, and that the Government can prove those amounts beyond a reasonable doubt.

(Doc. 30, FACTUAL RESUME, at 1-2)

trial, the United States could have proved the same beyond a reasonable

doubt." (*Id*. (emphasis supplied))

    4.    On April 14, 2008, Thompson entered a counseled guilty plea

to Count One of the Indictment.  (Doc. 68, Guilty Plea Transcript)

> THE COURT:    Let me get each of you to raise your right
> hand and take an oath, please.
>
>     (The Defendants were placed under oath.)
>
>     THE COURT:    . . . I need to tell each of you that
> you are now under oath. If you answer any of my questions
> falsely, your answers may later be used against you in another
> prosecution for perjury or for making a false statement.
>
>     Do you understand that . . . Mr. Thompson?
>
>     DEFENDANT THOMPSON:    Yes, sir.
>
>     .    .    .
>
>     THE COURT:    And Mr. Thompson, would you
> state your true, full name for the record.
>
>     DEFENDANT [THOMPSON]:    Don Ray
> Thompson, Jr.
>
>     THE COURT:    What is your age?
>
>     DEFENDANT THOMPSON:    32.
>
>     THE COURT:    And how much education have
> you completed?
>
>     DEFENDANT THOMPSON:    12th. Well, I got a
> little college, sir.
>
>     THE COURT:    Mr. Ratliff, to the best of your

knowledge, is Mr. Thompson fully competent to enter a valid plea today?

MR. RATLIFF:      He is, Judge.

.      .      .

THE COURT:      How about you, Mr. Thompson, have you ever been treated for any mental illness or addiction to narcotic drugs of any kind?

DEFENDANT THOMPSON:      No, sir.

.      .      .

THE COURT:      Are any of you currently under the influence of any drug or medication or alcoholic beverage of any kind? . . . Mr. Thompson?

DEFENDANT THOMPSON:      (No audible response.)

THE COURT:      Are you currently under the influence of any drug or medication?

DEFENDANT THOMPSON:      Medication for high blood pressure . . . .

.      .      .

THE COURT:      . . . Is that affecting you in any way?

DEFENDANT THOMPSON:      No, sir, not at all.

.      .      .

THE COURT:      Have each of you received a copy of the indictment in your case, had a full opportunity to read it and review it with your attorney, and do you understand the charge contained in the indictment? . . . Mr. Thompson?

13

DEFENDANT THOMPSON:        Yes, sir.

.        .        .

THE COURT:        Is it necessary that I read the indictment to you . . . Mr. Thompson?

DEFENDANT THOMPSON:        No, sir.

.        .        .

THE COURT:        Now, are each of you fully satisfied with the representation that you've received from your attorney in this case, and have you fully discussed with your attorney all of the facts surrounding the charge? . . . Mr. Thompson?

DEFENDANT THOMPSON:        Yes, sir.

.        .        .

THE COURT:        Now, I've been furnished a written plea agreement in each of your cases, and this plea agreement appears to have your signature at the end of the plea agreement and also at the end of the factual resume.

Did you, in fact, sign the document[s], . . . Mr. Thompson?

DEFENDANT THOMPSON:        Yes, sir.

.        .        .

THE COURT:        By signing this document, you are acknowledging that you have reviewed it, that you've read it and reviewed it with your attorney, that you understand the terms and conditions of the plea agreement and the factual resume, and that you agree with it.

Is that true . . .  Mr. Thompson?

14

DEFENDANT THOMPSON:      Yes, sir.

.      .      .

THE COURT:      . . . Have there been any promises made to you by anyone or has anyone attempted in any way to force you to plead guilty or to pressure you or threaten you in any way . . . Mr. Thompson?

DEFENDANT THOMPSON:      No, sir.

.      .      .

THE COURT:      Now, the penalties that could be imposed if convicted of the charges in this case are outlined in the plea agreement, page three. And if convicted of Count One of the indictment, and this is for each of you, the punishment that could be imposed would be 10 years to life in prison, a fine not to exceed four million dollars, a supervised release term up to five years, and a mandatory special assessment of $100.

Do you understand that, . . . Mr. Thompson?

DEFENDANT THOMPSON:      Yes, sir.

.      .      .

THE COURT:      Are any of you presently on probation, parole, or supervised release in any other case that may be subject to revocation if convicted in this case?

.      .      .

THE COURT:      All right. How about for Mr. Thompson?

MR. RATLIFF:      No, Your Honor.

.      .      .

15

THE COURT:        And also for each of you, if convicted of the charges in this case, you may lose valuable rights, including the right to vote, the right to hold public office, the right  to serve on a jury, and the right to possess any kind of firearm. Because it's a drug offense, you could lose certain Federal benefits.

Do you understand that . . . Mr. Thompson?

DEFENDANT THOMPSON:        Yes, sir.

.        .        .

THE COURT:        The United States Sentencing Commission has issued guidelines for judges to consider in determining the sentence in a criminal case. Have you and your attorney talked about how those guidelines might affect your case . . . Mr. Thompson?

DEFENDANT THOMPSON:        Yes, sir.

.        .        .

THE COURT:        The way in which the Sentencing Guidelines apply to your case might be affected by what you say to the Court and to the probation officer. The Court will not be able to determine an appropriate sentence for your case until after a presentence report has been completed and you and the United States  have had an opportunity to challenge the facts  reported by the probation officer.

Do you understand that . . . Mr. Thompson?

DEFENDANT THOMPSON:        Yes, sir.

.        .        .

THE COURT:        The sentence imposed might be different from any estimate your attorney or anyone else might have given you. Do you understand that . . . Mr. Thompson?

DEFENDANT THOMPSON:      Yes, sir.

.       .       .

THE COURT:      After it has been determined what guideline applies to a case, the judge has the authority to impose a sentence that is more severe or less severe than the sentence called for in the guidelines.

Do you understand that . . . Mr. Thompson?

DEFENDANT THOMPSON:      Yes, sir.

.       .       .

THE COURT:      Under some circumstances, you and the United States each may have the right to appeal any sentence the judge imposes. For instance, you can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there's some other fundamental defect in the proceedings not waived by your guilty plea.

You also have the right to waive your right to appeal. And I see by your plea agreements that you are waiving your right to appeal any sentence imposed with the following exceptions: And that would be any punishment in excess of the statutory maximum, any punishment constituting an upward departure of the guideline range, and any claim of ineffective assistance of counsel.

Do you understand that . . . Mr. Thompson?

DEFENDANT THOMPSON:      Yes, sir.

.       .       .

THE COURT:      Parole has been abolished. If you are sentenced to prison, you will not be released on parole. Do you understand that . . . Mr. Thompson?

DEFENDANT THOMPSON:      Yes, sir.

.     .     .

THE COURT:        If the sentence is more severe than you expected or if I do not accept the sentencing recommendation in your plea agreement, you will still be bound by your plea. Even if you do not like the sentence imposed by the Court, you will not be able to withdraw your plea. The time to make that decision is now. Do you understand that . . . Mr. Thompson?

DEFENDANT THOMPSON:        Yes, sir.

.     .     .

THE COURT:        You have the right to plead not guilty to any offense charged against you and to persist in that plea.  You would then have the right to trial by jury.  During that trial, you would have the right to the assistance of counsel for your defense and to the appointment of counsel if you could not afford to hire one, the right to see and hear all of the witnesses and to have your attorney cross-examine them, the right to testify yourself or to decline to testify and remain silent, and the right to have the Court issue subpoenas for any witnesses you wish to call in your defense.

At the trial, you would be presumed to be innocent, and the United States would have the burden of proving that you are guilty beyond a reasonable doubt.  Before you can be convicted, all 12 jurors must be convinced that the United States has met that burden.

If you are found guilty after a trial, you would then have the right to appeal that conviction to a higher court, and if you could not afford to pay the cost of an appeal, the Government would pay those costs for you.

Do you understand all of that . . . Mr. Thompson?

DEFENDANT THOMPSON:        Yes, sir.

.     .     .

18

THE COURT:        If you plead guilty, however, and if the Court accepts your plea, there will be no trial; you will be waiving or giving up your right to a trial and all the other rights that I just described.

Do you understand that . . . Mr. Thompson?

DEFENDANT THOMPSON:        Yes, sir.

.        .        .

THE COURT:        Also included in your plea agreement is a factual resume which contains a statement of the elements of the offense which is charged in Count One of the indictment, and that states a violation of Title 21, United States Code, Section 846.  And the elements of that offense are that two or more individuals came to a mutual understanding to commit an unlawful act; and that you, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in the plan.

.        .        .

THE COURT:        Thank you.  And for Mr. Williams and Mr. Thompson, the Government also alleges that there were more than 50 grams of crack cocaine involved in the conspiracy.  Do you understand that those are the elements of the offense to which you are pleading guilty . . . Mr. Thompson?

DEFENDANT THOMPSON:        Yes, sir.

.        .        .

THE COURT:        And do you fully understand that if there's a trial in this case, the United States would be required to present sufficient evidence to prove each of these essential elements beyond a reasonable doubt . . . Mr. Thompson?

19

DEFENDANT THOMPSON:      Yes, sir.

.      .      .

THE COURT:      Also included in your factual resume is a statement of facts or statement of offense conduct. Did you, in fact, commit the acts do the things that you have admitted to in this statement of facts, . . . Mr. Thompson?

DEFENDANT THOMPSON:      Yes, sir.

.      .      .

THE COURT:      All right.  Then I find that the facts and acts to which you have admitted support a violation of the charge contained in Count One of the indictment.  How do you now plead to that charge, Mr. [Thompson], guilty or not guilty?

.      .      .

DEFENDANT THOMPSON:      Guilty.

.      .      .

THE COURT:      Mr. [Ratliff], are you aware of any reason the Court should not accept Mr. [Thompson's] guilty plea at this time?

.      .      .

MR. RATLIFF:      No, sir.

.      .      .

THE COURT:      . . . Then it is the finding of this Court in the case of the United States versus . . . Don Ray Thompson, Jr. . . . that . . . you are fully competent and capable of entering an informed plea, that you are aware of the nature of the charge and the consequences of your plea, and that your plea of guilty is a knowing and voluntary plea

20

> supported by an independent basis in fact containing each of
> the essential elements of the offense.  Your plea is therefore
> accepted, and . . . you are now adjudged guilty of that offense.

(*Id.* at 4, 5, 7, 8, 9, 10, 11, 12-13, 13, 13-14, 14, 15, 15-16, 16, 16-17, 17,

17-18, 19, 20 & 21)

5.     The Presentence Investigation Report was initially  prepared

by the Probation Office on June 11, 2008 and provided to counsel. (*See*

Doc. 39) Therein, Thompson and his attorney were notified that his offense

level was being increased by two levels because of his possession of a

firearm during the commission of the offense. (*Id.* at 7, ¶ 19) Thompson's

attorney specifically objected to this paragraph of the report, arguing that

"the firearm in question was lawfully purchased and possessed and not

connected to the instant offense." (Doc. 34, at 1; *see also* Doc. 35, at 3-4)[2]

The probation officer added an addendum to her report on July 15, 2008,

and addressed the defendant's primary objection, as follows: "If a weapon

is present, the firearm enhancement under U.S.S.G. § 2D1.1(b)(1) should be

applied, unless the defendant can demonstrate that it is 'clearly improbable'

that the weapon was connected to the offense . . . which does not appear to

---

[2]     In addition, Thompson's attorney argued the following: "The Defendant objects
to the conclusion in ¶ 60 that he does not qualify for further reduction of sentence under the
provisions of the safety-valve. Defendant submits that as the firearm enhancement is not proper
in this case, he should receive the benefit of the safety-valve and thus a further two point
reduction in his adjusted offense level and a guideline recommended sentencing range of 87-108
months based on an adjusted guideline range of 29." (Doc. 34, at 2)

be the case." (Doc. 39, ADDENDUM TO THE PRESENTENCE REPORT, at 1) Based upon a total offense level of 31, and a criminal history category of I, the probation officer recommended that Thompson receive a 120-month term of imprisonment,[3] a 5-year term of supervised release following his release from prison, and a special assessment of $100.00. (*Id*. at 1-3)

      6.     Because the parties could not agree on the total offense level, the following occurred during the sentencing hearing on September 4, 2008:

> THE COURT:    . . . Mr. Ratliff, I note that there's an objection to the firearm enhancement in the case. I assume that objection is still on the table; is that correct?

> MR. RATLIFF:    It is, Judge.

> THE COURT:    . . . I note that there are no objections to the content of the Presentence Report with regard to the factual scenario. And I assume that any testimony is just going to be offered to support what's already in the Presentence Report?

> MS. BEDWELL:    Yes, sir. And we probably can flesh out some of the details that might assist the Court if it's necessary to do that. In our view, it's not really a close call. The Defendant was using the residence on Goodpay as a location where he specifically sold drugs. The informant told the police that he took the weapon with him when he left the other residence. He had it there with him when they arrived to execute the search warrant. It was recovered from the house. And we believe that that's a sufficient evidentiary basis. But I do have the officer here, and he's prepared to flesh that out if the Court finds it necessary.

---

[3]    The guidelines produced a range of 120 to 135 months. (Doc. 39, SENTENCING RECOMMENDATION, at 1)

MR. RATLIFF:        Your Honor, we accept those facts as essentially correct. Our point here is that Mr. Thompson had a lawful right to possess that firearm. He had a pistol permit. He purchased that firearm from an authorized firearm dealer. When he arrived at the Goodpay residence, the firearm was placed in an area separate and apart from where Mr. Thompson was engaging in drug-related activity and drug-related transactions; and therefore, our argument is that firearm does not rise to the level necessary under 2D1.1.

THE COURT:        . . . Paragraph seven states that the confidential informant observed on February 4, 2008, Thompson in possession of a hundred and twelve grams of crack cocaine. Later in the month, the confidential informant was at Thompson's house, reported to the police that he saw half a pound of marijuana, a gun, and an ounce-and-a-half of crack cocaine

It was later that day . . . that the . . . confidential informant and Thompson drove to the house on Goodpay Avenue and, according to the confidential informant, Thompson was armed with the handgun.

. . . [P]aragraph eight refers to a controlled buy of crack cocaine followed by a search warrant which was executed on February 21st, 2008. The gun was recovered in the house along with drugs. And Mr. Thompson in paragraph 10 makes a statement claiming ownership of the crack cocaine in the sofa and the gun.

Are those the facts that you say are not in dispute?

MR. RATLIFF:        Essentially, Judge, yes, those facts are not in dispute. The distinction is that where the handgun was found in the house was in a separate bedroom. And it references in here that the gun was found in a separate bedroom while the drug transactions were occurring in the living room and the front area of the house.

THE COURT:        But there's no dispute that he

23

traveled to the house with a gun?

MR. RATLIFF:      There's no dispute that he traveled to the house with the gun. But Your Honor, I would suggest that there was no drug-related transactions occurring during that transit. And you know, our position would be . . ., especially in light of the recent decision in Heller[,] that Mr. Thompson had a right, an inalienable right to possess a firearm for self-defense and self-preservation, and that was separate and apart from what he was going to do at the Goodpay residence with respect to the drug transaction.

THE COURT:      Does that statement make it clearly improbable that the gun was not connected to the controlled substance, possession of the controlled substance or the possession with intent to distribute the controlled substance? That's the standard by which I have to apply it.

It may well be that he has a permit for the gun and he carries it lawfully on some occasions, but the question is was it unlawfully possessed on this occasion, on . . . more than one occasion, because it was connected to the controlled substances, though? And that's the issue.

MR. RATLIFF:      I would say that the one pertinent fact that gives rise to the belief that it was not reasonably connected to the offense was that when Mr. Thompson arrived at the Goodpay residence, he takes that firearm and he places it in a separate room of that residence, and then he goes on to conducting drug-related transactions in a separate part of the residence, in the living room, while the gun is placed in the bedroom. And that's what I would say is what makes it clearly improbable that it's connected.

THE COURT:      Ms. Bedwell?

MS. BEDWELL:      Your Honor, even if the Defendant feels confident enough at his drug house location that he doesn't have to wear the weapon, the transportation of the drug dealer with his drugs to that location, he was armed with a gun. And that certainly is a sufficient evidentiary basis

24

to support this enhancement.

Whether he could lawfully possess the gun if he wasn't a drug dealer is not the point. The point is, and Congress has made it clear with this – the application of this guideline that drug dealers who have firearms under [] circumstances like this, that entitles the Government to request and receive this enhancement as a sentencing guideline factor. The legality of the Defendant's possession of the weapon is beside the point.

THE COURT:        Mr Ratliff?

MR. RATLIFF:        Nothing further, Your Honor. I think that Mr. Thompson's own actions in this case speak to the fact that the firearm possession was separate and distinct from the drug-related transactions.

THE COURT:        Well . . . the fact that the gun was found in a room and not physically on Mr. Thompson at the time of his arrest is certainly a factor the Court considers. But we also have the information that he traveled to the house for the drug deal with the drug dealer as a drug dealer, the confidential informant making arrangements to buy drugs from him, and he carries a firearm with him.

So . . . the cases where there's a close issue are those cases where the gun doesn't belong to the defendant or there's some evidence that the gun was in a safe or in a closet and had been there for some time, not one that's transported back and forth . . . for the purpose of what it appears to be, to protect the individual during the course of a drug deal.

And that's what it appears in this case. He doesn't get to pick and choose the times that he lawfully and unlawfully possesses the gun and then try to convince the Court that the gun . . . some way is not associated with a drug deal.

From ought that I see, assuming that these facts are undisputed here, . . . the Defendant would not meet his burden . . . of showing that it's clearly improbable that the firearm is not connected to the possession with intent to distribute the

cocaine in this case.

Ms. Bedwell, are you compelled to present any more evidence on that issue?

MS. BEDWELL:     No, sir, Judge. We are prepared to do that if the Court finds it necessary, but I think even given the scenario that's contained in the Presentence Investigation Report, which the Defendant does not dispute, that provides the Court with a sufficient basis to make this finding.

THE COURT:          Mr. Ratliff, anything further?

MR. RATLIFF:          No, Your Honor.

THE COURT:          . . . [B]ased on the . . . undisputed evidence contained in the Presentence Report and that which has been articulated to me today, I find that the Defendant's objection to the firearm enhancement is not well taken and is overruled.

Any other matters that we need to take up with regard to the Presentence Report?

.          .          .

MR. RATLIFF:          I'm sorry.  Normally, the process of the Court is to allow Mr. Thompson an opportunity to speak at the end.  Mr. Thompson is adamant that he be given a chance to address the Court, however, regarding the Presentence Report.  So, I'd ask the Court for leave to do that at this time.

THE COURT:          Sure.  Come on up, Mr. Thompson. . . . Let me get you to stand in front of the microphone, if you would, please. Raise your right hand and take an oath. . . . Did you want to question him, or does he just want to make a statement?

MR. RATLIFF:          No, Judge. He has a statement that he wants to make.

26

THE COURT:        All right. Mr. Thompson.

.        .        .

DEFENDANT:        . . . I guess first and foremost, I would like to apologize to the Prosecutor as well as the Federal agents.

. . . [W]hen I came home from Ohio, the reason for the gun all together was because I had uncles on drugs, and I had cousins at my grandmother's household using drugs, having shootouts, things of that nature there.

My grandmother, she's 87 years old. She didn't want to live with anyone but me. And when I came home, I stayed down the street between my uncle's house and my brother's house . . . until my grandmother came home.

When my grandmother came home, she wrote a letter to all the police precincts stating that she wanted none of my uncles or none of my cousins to be in the house with her because they sold . . . everything from out of her house. They disrespected her. They had folks knocking on the door at three or 4:00 in the morning, things of that nature there. They rob off the avenue where my grandmother lives. They steal. They do all that.

The purpose for me having a handgun was just to protect my grandmother, not even to protect me.  I can care less what anybody take from me.  But when the Federal agents came and they got me, everything that they asked me, I was truthful with them from the start, from the beginning. They said that the gun charge would not be an issue and they weren't going to put it in.

The day of my pretrial hearing, my lawyer introduced himself to me, and the first thing he said that, you know, police officer[s] were liars, and the only person that I had to depend on was either my lawyer or the Federal agents.

Well . . . I didn't want to plead guilty. . . . [L]ike I

27

explained to him . . . the drug amounts and everything in the factual statement were incorrect.  I've never had them numbers.  I never had them. . . . I'm not a drug dealer, Your Honor.  I'm not a thug.

Your Honor, when I came home, I had 19,000 and something dollars . . . where you file for unemployment.  It got denied.  I appealed it.  I knew it was time for me to go back to work.  I was diagnosed with high blood pressure.  I couldn't go back to work.

You know, listening to and being around the wrong people, sometimes you get influenced in the wrong ways.  And I know that I made a mistake.  I made a big error in my life because . . . I went against everything I believed in to further try to help my family.

But then I didn't find out that the guilty plea was on the 14th of April until late in the evening on the 9th of April.  And my lawyer didn't tell me; my probation officer told me.  So, when I went to talk to my lawyer, I told him that I didn't want to admit to that stuff because that stuff was not true.

So, I told him I had to talk to another lawyer because I was supposed to have been able to depend on him.  And I went that Friday and I got in contact with a lawyer.  But unfortunately, he was taking care of some business in Bay Minette, so he wasn't able to call me back until Saturday.

Well, Sunday, I called Major Whitfield, and I had a long talk with [him] over the phone about me pleading guilty to things that . . . were incorrect.  The things that I told were the facts were the truth from the start to the finish and then, you know, whoever their witnesses was, they gave them untrue facts.

And like I explained to them, I know that I did wrong, but . . . I can only tell you what I know about any situation.  These guys that I was dealing with, Your Honor, I didn't know them just like they didn't know me, Your Honor.  But unlike them, I don't owe no one nothing but to love everyone.

28

So, I'm not going to bear false witnesses on people to get my time cut and to do things that's unright and unjust, because to allow them to do it to me is unright and unjust.

.          .          .

So, from the beginning when they asked me for my help, and I helped them, they went about all wrong, they had put my life in danger then the way that it happened.  And they assured me when we got back for the debrief that . . .  the United States were going to protect you.  We're going to take care of you is what they said to me.  So, I did everything that I could to help them.

Well, the night that I spoke to Major Whitfield, Major Whitfield told me that the next day, that Monday morning was when I came in to report.  He had me sign the plea agreement maybe 10, 15, 20 minutes before we came in the courtroom.  Nothing was read to me.

But like I explained to my lawyer []– he told me . . . if they give you 10 years, all the United States Government has to do is walk into these Federal holding cells, hold up your pictures, and [] anyone who doesn't know you . . . they'll say that they dealt with you, they can just constantly stack more time and more time and more time on you.

Well, I went from the beginning at the POC, I was on a conspiracy from a five to 20 side.  Somehow I wound up on the conspiracy side from a 10 to life with folks just stacking stuff on me, stuff that didn't belong.

But now my lawyer says that conspiracy means that if you are a basketball and you're just a letter inside a ball, then you're the whole thing.  When I talked to another lawyer, the lawyer said that it's more like if you are a rim, and if you are a spoke in the rim to keep the rim turning.

But the problem is, I see where I was a spoke for a 13-inch rim, and in order to make that spoke work for 18 or a 22, you have to take that spoke out and you have to add stuff that

29

doesn't belong in order to fit that spoke back in again, which is unfair and unjust.

My lawyer told me that they didn't have to find me guilty by a reasonable doubt; they only have to find me guilty by probable cause. And I have too much in my life at stake for probable cause. But I don't want to sit away for 10 years for something I didn't do. I know I don't want to sit away for 30 or 40.

So, when I spoke to Major Whitfield, Major Whitfield said the best thing for me to do is just come in, say that I accept the guilty plea. It won't be no time at all, probation this, probation that. Say he spoke to the U.S. prosecutor and say that he took her out to dinner in order for her to take the gun charge away because I gave to them–

MS. BEDWELL: Your Honor, that is absolutely false. And I have sat here as long as I could and listened to this Defendant accuse the Government of improper conduct, but that is the last straw. And I object to it and move that it be stricken.

THE COURT:       All right. Mr. Thompson, you have a right to make a statement to this Court, but . . . I would caution you to be very careful about being disrespectful or making falsehoods or making false statements to this Court. You're not helping yourself at all.

DEFENDANT:       Your Honor, all I've done was told the truth from the start.

MS. BEDWELL:    Your Honor, we move the Court to revoke the Defendant's acceptance of responsibility. It is plain from his conduct and his attitude that he has not accepted responsibility for what he's done. . . .

THE COURT:       You're digging the hole deeply here, Mr. Thompson.

DEFENDANT:       Okay. Your Honor, what I'm

saying is even with my lawyer, even with my lawyer saying to me that, okay, acceptance of responsibility.  Acceptance of responsibility, Your Honor, I pled guilty to something that I didn't do because my lawyer told– I knew if I accepted . . . responsibility, three points would be lifted from what they told me in the POC.

Now, they take out the things that they say I did wrong, and they didn't take them out, they added those numbers into the Count One conspiracy that they asked me to do.  When I told my lawyer that a lot of the things on the factual [resume] weren't true, my lawyer said either I'm going to say guilty to all of it or not guilty to none of it.

Now, acceptance of responsibility, I said guilty because the things that they said that they threw away, Your Honor, they put into the conspiracy.

MS. BEDWELL:     Your Honor, he just said he pled guilty to what he didn't do.  We move the Court to revoke his acceptance of responsibility.

.     .     .

DEFENDANT:        . . . The only thing that I can tell you is the truth.  When I spoke to Major Whitfield over the phone, sir, all . . . I'm telling you the reasons why I came and said that I was guilty all together.  I'm not trying to dig a hole deeper for myself.  I'm not trying to play games with anyone here.  I know that I did wrong.  I know that I made a mistake.  And at the end of the day, I'm faced with what I'm faced with because of the one mistake that I made.

.     .     .

But on top of the mistake that I made, there are things that have been said, things that are not right, not correct, because I would spend [$]40, $50, Your Honor, and make $47 back.  I've . . . never had money to spend to those numbers and those amounts.  My lawyer said the amount is not the problem.  The amount really doesn't matter, you know, but

31

obviously everything matters.  It seems like nothing matters to no one when it's concerning me.

THE COURT:          Anything further?

DEFENDANT:          Yes. One more time, I would like to deeply, deeply apologize if I've offended anyone, if I hurt anyone, if I disrespected anyone.  But I was only trying to lead you to let you know the reason why I accepted my responsibility for something that I did plus the things that I didn't do was because I thought that it would make it better on myself.  But obviously, you know, me being ignorant to the law is me being ignorant to the law.  And I still don't know the law.  I don't know more today than I knew when I got into this mess.

I know when the U.S. Government said that, you know, I was responsible, they was responsible for me and they would take care of me, Your Honor.  Your Honor, when I started getting threatening messages and things of that there, Your Honor, I called Major Whitfield and spoke to him about it.

For the past six months, I've been on pretrial release. I haven't had an ankle bracelet or anything, Your Honor. I stayed in the corner of a room in my house and read the Bible. That's all I did. Was afraid to go to church because the church that I attend has cameras. Because when I spoke to Major Whitfield telling him that my life was put in danger, he replied to me, well, no one said nothing to me about it, so you're okay. But I'm not okay when I put my life once again in folks' hands that I think is supposed to protect me and stand by me, and it doesn't happen.

Nothing further, Your Honor.

THE COURT:          . . . Mr. Ratliff, anything further with regard to the Presentence Report?

MR. RATLIFF:      No, Judge.

THE COURT:        . . . Then the Court will adopt the Presentence Report as published, noting that the Sentencing Guidelines have been accurately calculated.

Also, I will accept all of the factual information in the report, there being no objections to the factual information that's contained in the report.  The base offense level is 32.  There's a two-level enhancement for possession of a firearm.

Mr. Thompson, you are dangerously close to losing acceptance of responsibility.  I'm quite confused by what you have told me. [On the] one hand, you say you're not a drug dealer; on the other hand, you say you made a mistake.  The Presentence Report is full of your statements to law enforcement about your drug dealings and, you know, there's no question in my mind that you pled guilty because you are guilty.  And for you to stand there and say that you are not a drug dealer but you made a mistake is inconsistent, it's inconsistent with what is in the Presentence Report which is chock full of your drug dealings.

So, if you want to make another statement here, you are real close to losing acceptance of responsibility, and the sentence is going to go up much higher if you do.  You understand that?

DEFENDANT:      Yes, sir.

THE COURT:       Okay. Make your statement then.

DEFENDANT:      Your Honor, what I'm saying is that . . . I had made a statement, and the statement that I made is the same statement that I stand for right now, Your Honor.

Your Honor, . . . the amounts that I've purchased from the people that I've dealt with . . . were the only amounts that I've purchased.  And the only thing that I was stating, Your Honor, were that from the amounts that I admitted to, these amounts almost tripled.

The mistake that I made was trying to sell drugs.  I'm

33

not a drug dealer.  I'm not a hustler.  I tried it, but what I'm saying is the amounts that I owned up to in the beginning, those were the amounts that I did.  Where the rest of these amounts came from, Your Honor, is unknowledgeable to me.

THE COURT:        Well, the report indicates that you received a total of about two ounces of crack cocaine from some guy named Burke.

DEFENDANT:        Yes, sir.

THE COURT:        You said that.

DEFENDANT:        Yes, sir. []

THE COURT:        You were dealing with other individuals who are identified in the report.

DEFENDANT:        Yes, sir.

THE COURT:        So, the report is just full of instances where you– whether you say it's trying to be a drug dealer or not, you were a drug dealer.  And that's what you stand guilty of in this court, dealing drugs and possessing a gun in relation to those.

THE DEFENDANT:        Yes, sir.

THE COURT:        Now, again, you are welcome to say whatever you want to say, but I will caution you that you are again close to losing any credit for acceptance of responsibility in this case.

Do you want to say anything further?

DEFENDANT:        No, sir.

THE COURT:        All right. Then . . . you receive . . . a three-level reduction for acceptance of responsibility, producing an adjusted offense level of 31. You have zero criminal history points, placing you in Criminal History

34

Category I, generating a guideline range of 108 to a hundred and thirty-five months with a mandatory minimum of 120 months.

Ms. Bedwell, you have anything you want to say before sentence is imposed?

MS. BEDWELL:     Your Honor, we believe that the record supports the Government's position that the Defendant has not accepted responsibility for his relevant conduct for the conduct which forms the basis of the information in the Presentence Investigation Report, and we object to the Court's failure to remove that reduction from the Presentence Investigation Report.

THE COURT:     Note your objection. Mr. Ratliff, anything further before sentence is imposed?

MR. RATLIFF:     No, Your Honor.

[]

DEFENDANT:     Your Honor, what I asked my lawyer was . . . he said that when I came in today, because I felt like I was misrepresented, I could get another lawyer. I was wondering, Your Honor, is it possible for me to get another lawyer? Also, if possible, get Major Whitfield in here so that he can verify that what I was saying was true, Your Honor?

. . . [A]ll I know what to do is be truthful about my actions . . . . I want to go to work. . . . [T]his is not my life. I made one mistake. I'm here because of the mistake that I made. . . .

THE COURT:     . . . You're right, Mr. Thompson, you made a mistake.  And it wasn't just one mistake, it was several mistakes.  You made a decision to get involved in the distribution of illegal drugs.

DEFENDANT:        Yes, sir.

THE COURT:        And because you did and because you were caught and because you confessed your actions in this case and because you determined at one point that you needed to plead guilty– and I will say you needed to plead guilty in this case because it would have made no sense to go to trial with the evidence in this case.  You would have been convicted in front of a jury, and I'm sure Mr. Ratliff told you that.  The evidence is strong in this case against you.  It's strong, as strong as any case I see in this Court.  You were going to be convicted, so it was in your best interest to plead guilty.

DEFENDANT:        Yes, sir.

THE COURT:        You had an opportunity to cooperate.  That's the way you play the game in this Court.  You cooperate and you get credit for that cooperation.  You made a decision, and you told me your reason for making the decision, that you didn't want to cooperate in this case.

DEFENDANT:        Yes, sir.

THE COURT:        So, because you did not cooperate –

DEFENDANT:        No, sir, I did.

THE COURT:        No, no, no, no. We're through. Because you did not cooperate in this case, then the Government has filed no motion for a downward departure on your behalf, and they wouldn't at this point based on what you've just said in this courtroom. . . . Because you did not and because the Government ha[sn't] filed a motion for downward departure in this case, this Court has no discretion but to give you no less than the mandatory minimum in this case, which is a hundred and twenty months. That's . . . the lowest sentence I can give in this [case].

36

I tell you, based on what I've heard here today, I might feel compelled to give you more than that, but I'm going to find that a sentence of a hundred and twenty months accomplishes the sentencing objectives of Section 3553(a) of Title 18.  And even if I got the Guidelines wrong in this case, it is my decision and my feeling that a sentence of a hundred and twenty months is reasonable and necessary in this case based on your activities, based on what's been presented to the Court today and through the Presentence Report.

Accordingly, pursuant to the Sentencing Reform Act of 1984, it's the judgment of this Court that you, Don Ray Thompson, Jr., are hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 120 months as to Count One. The Court recommends that you be imprisoned at an institution where a residential, comprehensive, substance abuse treatment program is available.

Upon release from imprisonment, you shall be placed on supervised release for a term of five years as to Count One. Within 72 hours of release from the custody of the Bureau of Prisons, you shall report in person to the probation office in the district to which you are released.

While on supervised release, you shall not commit any Federal, state, or local crimes, you shall be prohibited from possessing a firearm or other dangerous device, and shall not possess a controlled substance. In addition, you shall comply with the standard conditions of supervised release as recommended by the  Sentencing Commission and on record with this Court.

The Court orders that you also comply with the following special condition of supervised release; that is, that you shall participate in a program of testing and treatment for drug and/or alcohol abuse as directed by the Probation Office.

The Court finds that you do not have the ability to pay a fine; therefore, no fine is imposed.

For the reasons given, the Court finds that the sentence

imposed addresses the seriousness of the offense and the sentencing objectives of punishment, deterrence, and incapacitation.

It is ordered that you pay a special assessment in the amount of $100 on Count One, which is due immediately.

You can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there's some other fundamental defect in the proceedings not waived by your guilty plea or your plea agreement. You have the right to apply for leave to appeal in forma pauperis, and the Clerk of Court will prepare and file notice of appeal upon your request. With few exceptions, any notice of appeal must be filed within 10 days of the date of judgment.

I note that there are remaining counts of the indictment.  Does the Government have a motion?

MS. BEDWELL:     Move to dismiss remaining counts as to this Defendant, Your Honor.

THE COURT:        The Government's motion is granted.  Counts Two and Three of the indictment are hereby dismissed.

(Doc. 61, at 2-8, 8-12, 12-15, 16, 17-18 & 19-26)

7.     Thompson's trial attorney filed written notice of appeal on September 5, 2008 (Doc. 48) and concurrent therewith a motion to withdraw (Doc. 49; *see also* Doc. 61, Sentencing Tr., at 26 ("I'm sure Mr. Thompson would want to appeal, and ask the Court for permission to withdraw and the Court appoint new counsel for appeal. I think that would be in his best interest. THE COURT: All right. We'll appoint counsel.")).

The motion to withdraw was granted on September 9, 2008 (Doc. 50) and Thompson was appointed Richard Shields, Esquire to pursue his direct appeal (*see* Doc. 55). Appellate counsel filed written notice of appeal on September 22, 2008 (Doc. 52) from the Court's judgment entered on September 16, 2008 (Doc. 51).

8.      On April 20, 2009, the Eleventh Circuit granted the United States' motion to dismiss Thompson's appeal "due to a valid appeal waiver contained in Appellant's plea agreement[.]" (Doc. 71, at 3)

9.      Thompson filed the instant motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 on September 12, 2009. (Doc. 73, at 10) Therein, petitioner contends that his trial attorney provided constitutionally ineffective assistance of counsel by (1) failing to timely inform him, prior to entry of his plea, that the government would seek a two-level gun enhancement; and (2) failing to assert a breach of the plea agreement by the government due to its failure to make a motion for downward departure. (*See id.* at 4 & 5) In reply to the government's response, Thompson arguably modified his first ground of claimed ineffective assistance of counsel by stating simply that his attorney failed "to prepare for the firearm enhancement at the [s]entencing hearing." (Doc. 82, at 7; *see also id.* at 3 ("The Defendant objected to the firearm enhancement [and] his [a]ttorney was aware of his objection. Mr. Ratliff did

not give written objection nor did he investigate or call witness[es] on the firearm enhancement. Defendant[,] when he was inform[ed] that the enhancement issue had not been explored by his [a]ttorney[,] he asked him to withdraw from the case. . . . Attorney Ratliff fail[ed] to investigate the firearm enhancement evidence or have a hearing calling for witness[es] on the issue.")).

## CONCLUSIONS OF LAW

1.      28 U.S.C. § 2255 reads, in relevant part, as follows: "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."

2.      In this instance, Thompson contends that constitutionally ineffective assistance of counsel entitles him to the relief afforded by 28 U.S.C. § 2255.[4] In order to establish a claim of ineffective assistance of

_____

[4]      Once a criminal defendant enters a guilty plea, he waives all non-jurisdictional challenges to the conviction's constitutionality and only an attack on the voluntary and knowing

counsel, a petitioner is required to show (1) that his attorney's

representation fell below "an objective standard of reasonableness" and (2)

that a reasonable probability exists that but for counsel's unprofessional

conduct, the result of the proceeding would have been different. *Strickland*

*v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The

petitioner bears the burden of proof on the 'performance' prong as well as

the 'prejudice' prong of a *Strickland* claim, and both prongs must be proved

to prevail." *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001),

*cert. denied sub nom. Johnson v. Nagle*, 535 U.S. 926, 122 S.Ct. 1295, 152

L.Ed.2d 208 (2002).[5] The *Strickland v. Washington* standard for evaluating

claims of ineffective assistance of counsel was held applicable to guilty

pleas in *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d

203 (1985).

---

nature of the plea can be raised. *See McMann v. Richardson*, 397 U.S. 759, 772, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). Stated differently, "a voluntary and intelligent plea made by an accused person, who has been advised by ***competent counsel***, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508, 104 S.Ct. 2543, 2546-2547, 81 L.Ed.2d 437 (1984) (emphasis supplied). Therefore, when a § 2255 motion is filed collaterally challenging convictions obtained pursuant to guilty pleas, "the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569, 109 S.Ct. 757, 762, 102 L.Ed.2d 927 (1989).

[5]      It is proper in considering claims made by a federal prisoner under § 2255 to look for guidance from cases discussing claims raised by state prisoners under 28 U.S.C. § 2254. *See Hagins v. United States,* 267 F.3d 1202, 1205 (11th Cir. 2001) (citing *Holladay v. Haley*, 209 F.3d 1243 (11th Cir. 2000)), *cert. denied*, 537 U.S. 1022, 123 S.Ct. 545, 154 L.Ed.2d 432 (2002).

> To succeed on such a claim, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).[6] In addition, the defendant must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59, 106 S.Ct. at 370. In other words, . . . [a petitioner] "must show that there is a reasonable probability that, but for counsel's errors, he would . . . have pleaded [not] guilty and would . . . have insisted on going to trial." *Hill*, 474 U.S. at 59, 106 S.Ct. at 370.

*Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995) (footnote, brackets and ellipses added), *cert. denied sub nom. Coulter v. Jones*, 516 U.S. 1122, 116 S.Ct. 934, 133 L.Ed.2d 860 (1996).[7] Of course, in the context of sentencing following entry of a guilty plea the court simply considers whether petitioner has established, in accordance with *Strickland, supra*, that his attorney was deficient and that he was prejudiced by this deficiency in performance. *See, e.g., Myers v. United States,* 2009 WL 1505638, *1 (W.D. Pa. 2009) ("In order for petitioner to succeed on an ineffective assistance of counsel claim, he must prove: (1) that his counsel was deficient; and (2) that he was prejudiced by his counsel's deficiency.").

---

[6]     "When analyzing ineffective-assistance claims, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Smith v. Singletary*, 170 F.3d 1051, 1053 (11th Cir. 1999) (citations omitted).

[7]     "'[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" *Johnson, supra,* 256 F.3d at 1176 (citation omitted).

3.      When applying the *Strickland* standard, it is clear that courts "are free to dispose of ineffectiveness claims on either of its two grounds." *Oats v. Singletary*, 141 F.3d 1018, 1023 (11th Cir. 1998) (citation omitted), *cert. denied sub nom. Oats v. Moore*, 527 U.S. 1008, 119 S.Ct. 2347, 144 L.Ed.2d 243 (1999); *see also Butcher v. United States*, 368 F.3d 1290, 1293 (11th Cir. 2004) ("[O]nce a court decides that one of the requisite showings has not been made it need not decide whether the other one has been.").

4.      The undersigned agrees  with the government that the sentence-appeal waiver contained in Thompson's plea agreement (*see* Doc. 30, at ¶¶ 17-19) precludes petitioner from contesting his counsel's effectiveness related to his sentencing, *Williams v. United States*, 396 F.3d 1340, 1342 (11th Cir.) ("While we have not addressed whether a sentence-appeal waiver includes the waiver of the right to challenge the sentence collaterally in the context of a § 2255 petition asserting ineffective assistance of counsel, every Circuit to have addressed the issue has held that a valid sentence-appeal waiver, entered into voluntarily and knowingly, pursuant to a plea agreement, precludes the defendant from attempting to attack, in a collateral proceeding, the sentence through a claim of ineffective assistance of counsel during sentencing. We are persuaded by the foregoing consistent line of authority from our sister Circuits on this issue, particularly since a contrary result would permit a defendant to

43

circumvent the terms of the sentence-appeal waiver simply by recasting a

challenge to his sentence as a claim of ineffective assistance, thus rendering

the waiver meaningless." (internal citations omitted)), *cert. denied*, 546

U.S. 902, 126 S.Ct. 246, 163 L.Ed.2d 226 (2005), given the Eleventh

Circuit's determination that the sentence-appeal waiver was entered into

voluntarily and knowingly (*see* Doc. 71, at 3 ("Appellee's motion to

dismiss this appeal due to a valid appeal waiver contained in Appellant's

plea agreement is GRANTED.")). In other words, petitioner cannot now

attack in this § 2255  the two-level gun enhancement to his sentence[8] based

upon a claim that his attorney was ineffective in failing both to properly

inform him of the enhancement and to properly argue against such

enhancement. *Williams, supra.* Accordingly, this claim of ineffective

assistance of counsel is precluded by Thompson's valid sentence-appeal

waiver.[9]

---

[8]     The government has read Thompson's § 2255 motion as raising a third claim of ineffective assistance of counsel, namely, that his attorney "'failed to investigate the facts and circumstances of the case.'" (Doc. 76, at 10; *compare id. with* Doc. 73, at 4) While the undersigned agrees with the government that this claim of ineffective assistance of counsel has been waived by petitioner's knowing and voluntary plea (*compare* Doc. 76, at 10-11 *with*  Doc. 71, at 3), it need also be noted that this assertion is conclusory and baseless as petitioner has pointed to no "facts" or "circumstances" which counsel could or should have found that would have benefitted petitioner such that he would have pleaded not guilty and would have insisted on going to trial. In other words, petitioner has established neither prong of the *Strickland/Lockhart* standard in this regard.

[9]     Parenthetically, however, the undersigned would note that petitioner's firearm-enhancement claim misses the mark because his attorney filed a written objection to the firearm-

5.      Petitioner's sole claim of ineffective assistance of counsel that need be addressed on its merits is his contention that trial counsel was ineffective at sentencing for failing to assert a breach of the plea agreement by the government due to its failure to make a motion for downward departure. This claim is meritless in light of the Court's specific findings during the sentencing hearing that Thompson had not cooperated in the case and because he had not cooperated the government had filed no motion for downward departure. (Doc. 61, at 23; *see also id.* ("[A]nd they wouldn't at this point [file a motion for downward departure] based on what you've just said in this courtroom."))[10] Consequently, counsel's failure to assert a breach of the plea agreement due to the government's refusal to make a

---

enhancement paragraph of the Presentence Report prior to sentencing (Doc. 34) and vigorously argued during sentencing that application of this enhancement was not appropriate in Thompson's case (Doc. 61, at 2-8). Thompson has not come forward with any credible evidence that his attorney could have established through witnesses that application of the firearm-enhancement was improper in his case; more specifically, he has not established that it was clearly improbable that the firearm was not connected to his possession with intent to distribute crack cocaine. Accordingly, the undersigned discerns a lack of cause and prejudice in this regard.

[10]      The plea agreement is written heavily in the government's favor, providing not only that a decision regarding whether Thompson had provided substantial assistance was specifically reserved to the United States but as well that Thompson understood that "should he provide untruthful information to the United States at any time, or should he fail to disclose material facts to the United States at any time, the United States will not make a motion for downward departure." (Doc. 30, at ¶ 16.g.) Based upon Thompson's statements during the sentencing hearing it is clear that untruthful information had been provided to the government and that the United States had no obligation to make a motion for downward departure in petitioner's case. Again, therefore, petitioner's attorney was not deficient in failing to assert a breach of the plea agreement on account of the government's failure to make a motion for downward departure.

motion for downward departure cannot be said to be constitutionally deficient.  "[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance [of counsel]." *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir.) (citation omitted), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 589, 130 L.Ed.2d 502 (1994).[11]

6.      Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the undersigned recommends that a certificate of appealability in this case be denied. 28 U.S.C. foll. § 2255, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1).  A certificate of appealability may issue only where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2243(c)(2). Where, as here, a habeas

---

[11]      A district court must order an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief[.]"  28 U.S.C. § 2255(b).  In other words, Thompson "is entitled to an evidentiary hearing on [his] ineffective assistance claim if []he alleges facts which, if proven,  would entitle [him] to relief." *Ramirez v. United States*, 260 Fed. Appx. 185, 187 (11th Cir. 2007) (citations omitted).  "A district court, however, need not conduct an evidentiary hearing if it can be conclusively determined from the record that there was no denial of effective assistance of counsel." *Id*. Because there was no denial of effective assistance of counsel in this case, an evidentiary hearing is not warranted.

petition is being denied, in part, on procedural grounds without reaching the merits of an underlying constitutional claim, "a COA should issue [only] when the prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling[,]" *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542 (2000), and, in part, on the merits of an underlying constitutional claim, a COA should issue only when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[,]" *id.*; *see also id.* at 483-484, 120 S.Ct. at 1603-1604 ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were '"adequate to deserve encouragement to proceed further."'"); *see Miller-El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003) ("Under the controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve

encouragement to proceed further."'"). Because, as previously established, the appeal waiver in this case was found to be valid (Doc. 71, at 3), a reasonable jurist could not conclude either that this Court is in error in not addressing the merits of petitioner's ineffective-of-assistance-of-counsel claim as it relates to the firearm-enhancement, *see Williams, supra,* or that Thompson should be allowed to proceed further with respect to this claim. *Slack, supra*, 529 U.S. at 484, 120 S.Ct. at 1604 ("Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further.").  In addition, as it relates to petitioner's other assertion(s) of ineffective assistance of counsel, reasonable jurists could not debate whether Thompson's § 2255 motion to vacate should be resolved in a different manner or that the Sixth Amendment issue(s) presented are adequate to deserve encouragement to proceed further.

## <u>CONCLUSION</u>

The Magistrate Judge is of the opinion that petitioner's rights were not violated in this cause and that his request to vacate, set aside or correct his sentence should be **DENIED**. Petitioner is not entitled to a certificate of appealability and, therefore, he is not entitled to appeal *in forma pauperis*.

The instructions that follow the undersigned's signature contain

important information regarding objections to the report and

recommendation of the Magistrate Judge.

      **DONE** this the 18th day of March, 2010.

         s/WILLIAM E. CASSADY
        **UNITED STATES MAGISTRATE JUDGE**

## MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

l.     *Objection*.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to  do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982) (*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[12] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.     *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

---

[12]     Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]"  Fed.R.Civ.P. 72(b)(2).